UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cr. No. 21-10354-JEK |
| | ) |
| TAKARI ELLIOTT, | ) |
|     a/k/a "T-Paper," | ) |
|     Defendant | ) |

**GOVERNMENT'S OPPOSITION TO ELLIOTT'S MOTIONS IN LIMINE TO EXCLUDE COCONSPIRATOR STATEMENTS**

In its trial brief (ECF No. 1332), the government summarized several coconspirator statements that it intended to introduce against TAKARI ELLIOTT. At the same time, ELLIOTT moved in limine to exclude CW-3's anticipated testimony that Cameron Street member Marvin Viega, also known as "MV," told CW-3 that Viega and ELLIOTT murdered Manuel Duarte for money (ECF No. 1328). ELLIOTT also moved to exclude co-defendant Daronde Bethea's post-arrest recorded statement to murder CW-3 after CW-3 provided evidence against Bethea and other Cameron Street members (ECF No. 1329). The Court should deny these motions. Both are coconspirator statements made during and in furtherance of the Cameron Street racketeering conspiracy. Alternatively, the statements qualify as admissions against interest. And as to Bethea's statement, much of the content is not offered for the truth of the matter asserted and thus does not trigger the rule against hearsay.

<u>The Murder-For-Hire Conversation</u>. The third superseding indictment alleged that from 2010 to the present, the purposes of Cameron Street included the use of violence to enhance the gang's prestige, reputation, and position; to promote a climate of fear through violence; to keep rivals, victims, community members, and law enforcement in fear of Cameron Street and its members through violence; and to enrich its members (ECF No. 403 at ¶ 6). Among other

evidence, the third superseding indictment identified the October 13, 2020, murder of Manuel Duarte by ELLIOTT and Viega "in exchange for U.S. currency" as an act committed in furtherance of the Cameron Street enterprise. Id., ¶ 10 (dd).

To understand the depth of the connection between ELLIOTT and Viega, it is necessary to go back to January 9, 2011, after ELLIOTT, Viega, and Bethea were arrested fleeing from the Cameron Street neighborhood in a PT Cruiser armed with firearms and carrying masks:



[Jan. 9, 2011, crash of PT Cruiser containing ELLIOTT, Viega, and Bethea]

In the back seat, where ELLIOTT and Bethea had been seated, officer recovered a loaded .40 caliber firearm with a defaced serial number and two masks:



[Jan. 9, 2011, seizure of .40 caliber firearm with defaced serial number and masks from ELLIOTT and Bethea]

2

Officers encountered Viega outside the PT Cruiser armed with an assault rifle. When Viega pointed the gun at them, officers shot him.



[Jan. 9, 2011, seizure of assault rifle from Viega]

ELLIOTT and Bethea went to prison for three years for unlawfully possessing the gun in the back seat.[1] Viega served nearly ten years in prison for this assault and firearm offense.





With lawyers at the ready, Marvin Veiga (in hospital gown) and codefendants ▮▮▮▮▮ Daronde Bethea, and (partially hidden) Takari Elliott, were arraigned on firearms and other charges yesterday in Dorchester. Veiga is accused of pointing an assault rifle at police after a high-speed chase Saturday. (Pat Greenhouse/ Globe Staff)

---

[1] Once out of prison, both men continued to participate in various aspects of the Cameron Street enterprise. ELLIOTT celebrated a Cameron Street murder of a rival with other members (see ECF No. 1332 at pp. 9-10) and sold cocaine in the Cameron Street neighborhood, Cr. No. 17-10023-IT. Bethea shot a gang rival and committed a series of home invasion robberies, all of which were eventually incorporated into the third superseding indictment's racketeering conspiracy (ECF No. 403, ¶¶ (c), (z), and (aa)) and admitted by Bethea (ECF No. 647).

CW-3 will testify that during Viega's time in prison, Anthony Centeio, also known as "Wheezy," whom CW-3 identified as the leader of Cameron Street, kept Viega apprised of Cameron Street activities and membership. When Viega got out of prison, Viega reconnected with the gang and met with younger members like CW-3 who had joined the gang while Viega was serving his sentence. During CW-3's testimony before the Grand Jury, CW-3 identified a photograph of Viega as "MV" and described how CW-3 knew him:

> I knew Marvin because, like, when I started repping Cameron, he was serving a 10-year sentence for shooting at the cops. So everyone would talk about how crazy this dude is. And when he came home from jail, he introduced himself to me. So I met him after his 10-year sentence.

CW-3 will testify that CW-3 met Viega when Viega came to CW-3's home:

> So, I met MV because, at the time, was repping Cameron Street [sic]. And he wanted to know who else – like, he got – I'm considered a younger version of Cameron. So, he wanted to meet a younger kid from Cameron Street. So he came and introduced himself to me.

When Viega first met CW-3, Viega offered to supply CW-3 with cocaine, but CW-3, a marijuana user and occasional dealer, refused. CW-3 met with and spoke to Viega on several occasions, including after the Duarte murder:

> He had come to my house saying he had killed a man, a guy named Brava[2] in Brockton. And he is saying that he got paid well for it. He said that 10 guys in Brockton offered to gather some money and, I guess, it was $60,000 they paid – they paid him to kill a guy named Brava. And he told me that he had to split it two ways between him and a guy named T-Papes, because T-Papes was the driver and he was the shooter.

CW-3 identified a photograph of ELLIOTT as "T-Papes" and testified that he had seen ELLIOTT multiple times and knew ELLIOTT "from being from Cameron Street." Viega told CW-3 that the reason Duarte was killed was because "the dude Brava was going around robbing a lot of people

---

[2] Multiple witnesses will testify that Duarte's nickname was "Brava."

4

in Brockton. And they didn't like that." Accordingly, they "hired MV" to murder Duarte, and ELLIOTT drove Viega to and from the murder.

<u>Why Viega's Statement to CW-3 is Admissible</u>. ELLIOTT argues against admitting the Viega murder-for-hire conversation by claiming that "Viega flaunt[ed] his personal gain through a monetary transaction only [he] engaged in because it furthered his interest, not that of Cameron Streets" (ECF No. 1328 at 2).[3] As he does with the Bethea jail recording (discussed below), ELLIOTT misstates or ignores the evidence in the record. While they joined at different times, ELLIOTT, Viega, and CW-3 were all members of the Cameron Street enterprise. After Viega's release from prison and after Duarte's murder, during a conversation at CW-3's house, Viega explained to CW-3 why Duarte was murdered, how Viega and ELLIOTT got paid to commit the Duarte murder, and how Viega and ELLIOTT shared in the profits. CW-3 will testify that Cameron Street's reputation for violence was such that other criminals (including the Brockton area drug dealers tired of being robbed by Duarte) contracted with Cameron Street members to commit murder. CW-3 will testify that this murder-for-hire was another way for Cameron Street members to make money, like home invasion robberies or drug and gun trafficking, and the shocking nature of the murder enhanced the fearsome reputation of the gang.

Veiga's statements to CW-3 about the Duarte murder and ELLIOTT's involvement in it are clearly coconspirator statements made in furtherance of the conspiracy. <u>United States v. Rivera-Donate</u>, 682 F.3d 120, 132 (1st Cir. 2012), citing <u>United States v. Ammar</u>, 714 F.2d 238, 252 (3d Cir. 1983) (statements between coconspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy,"

---

[3] <u>See also</u> ECF No. 1328 at 5 ("This was a one-off opportunity that Mr. Viega conveys he took for his own enrichment").

5

further the conspiracy); United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) ("We think it is common ground – and common sense – that the reporting of significant events by one coconspirator to another advances the conspiracy"); United States v. Munson, 819 F.2d 337, 341 (1st Cir. 1987) (sharing of pertinent information about a conspiracy's mode of operation furthers conspiratorial ends). Viega is a member of an enterprise whose central tenet is murder. The murders and attempted murders committed by the gang enhance its prestige, reputation, and position, promote a climate of fear, and enrich its members (ECF No. 403 at ¶ 6). In this conversation, Viega informed a Cameron Street member (CW-3) about a murder he committed with another member of Cameron Street (ELLIOTT). The murder itself was a significant, well-planned, well-executed event; Viega's statement explained the motive for the killing; and Viega's statement explained why ELLIOTT participated with him in the murder, all of which served to update CW-3 on activities within the gang. See United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (statements reporting a botched murder attempt that killed five children instead of intended victim); United States v. Flemmi, 402 F.3d 79, 94-95 (1st Cir. 2005) (admission that coconspirator killed his stepdaughter kept defendant "abreast of current developments and problems" where defendant was charged with obstructing investigation concerning stepdaughter's death).

      Moreover, the government anticipates offering other evidence that the murder was committed in furtherance of the Cameron Street enterprise. An analysis of Duarte's cell phone, recovered from the murder scene, showed that Duarte and ELLIOTT spoke regularly to each other over the call function offered by the Snapchat application on the day of the murder. ELLIOTT's Snapchat display name was "CamIAm," an obvious reference to Cameron Street, and his username, "PapiPapes," included a reference to his gang name. Through an analysis of Duarte's

cell phone and Viega's cell phone, agents determined that Viega (captured in Duarte's Snapchat account by the display name "KC," for "KillaCam," a phrase regularly employed by Cameron Street members) also spoke to Duarte over Snapchat several times the day before the murder and twice on the day of the murder. And according to CW-3, social media images of Viega holding a large amount of money circulated among Cameron Street after the Duarte murder, and Cameron Street members later used these images to eulogize Viega after he was killed (ECF No. 1332 at 9). See United States v. Viserto, 596 F.2d 531, 536 (2d Cir. 1979) (proof of availability of cash to defendant with no legitimate occupation permitted as tending to show that it was derived from ill-gotten gains).[4]

Alternatively, Viega's statements to CW-3 are admissible as statements against interest. Federal Rule of Evidence 804(b)(3) allows for the admission of hearsay statements by an unavailable declarant that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and (B) if offered in a criminal case as one that tends to expose the declarant to criminal liability, is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it.

See United States v. Veloz, 948 F.3d 418, 430 (1st Cir. 2020). Before he died, Viega admitted to

---

[4] ELLIOTT's citations do not support excluding this evidence. See ECF No. 1328 at 6, citing United States v. Johnson, 469 F. Supp. 3d 193, 216 (S.D.N.Y. 2019); Lewis v. Walker, 2011 WL 999530 (N.D. Cal. Mar. 17, 2011. ELLIOTT contends these cases show that "reliance on Rule 801(D)(2)(E)" is often limited to "those instances in which statements were made in trustworthy circumstances." ECF No. 1328 at 6. But that misunderstands how the rule works. Congress carved coconspirator statements out of the general rule against hearsay "on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed. R. Ev. 801, advisory committee's note (1972).

CW-3 that he and ELLIOTT murdered Duarte for money. The statements inculpated Viega in a criminal act and in conspiracies with others to commit criminal acts and demonstrated an "insider's knowledge of a criminal enterprise and its criminal activities." United States v. Barone, 114 F.3d 1284, 1297 (1st Cir 1997). The fact that Viega made the statement to someone else in the enterprise, and not to the police, further supports admission. Barone, 114 F.3d at 1292. As noted above, there is substantial corroborating evidence for the statement, including the longstanding connection between ELLIOTT and Viega, the Snapchat communications (combined with Cameron Street designations) with Duarte leading up to the murder, and the social media images depicting Viega with large amounts of cash after the murder, not to mention ELLIOTT's prior admissions concerning the killing itself. Moreover, Viega did not mention ELLIOTT's involvement to "diminish his [own] role in the criminal activity described in the statements." See Barone, 114 F.3d at 1301 (noting that concerns of fabrication underlying corroboration requirement are diminished when declarant does not appear to be shifting blame to defendant). On the contrary, Viega identified himself as the shooter and ELLIOTT only as the driver, without attempting to shift blame – a strong sign of the statements' trustworthiness. Id. As such, Viega's statements to CW-3 are admissible, either as coconspirator statements that further the enterprise, or as statements against interest.

      ELLIOTT argues that, even if Viega's statements are admissible, they are "highly prejudicial." ECF No. 1332 at 9, citing Fed. R. Evid. 403. But evidence may be excluded under Rule 403 only if, as relevant here, "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Ev. 403. It is hard to imagine greater probative value than a statement that identifies the participants in a particular crime and a motive for the crime. As for unfair prejudice: "Of course, the evidence is incriminating; but all highly probative evidence is highly

prejudicial in this sense." United States v. Gonzalez-Sanchez, 825 F.2d 572, 581 (1st Cir. 1987). Evidence is <u>unfairly</u> prejudicial when, for example, it "is so shocking or heinous that it is likely to inflame the jury." Id. (citation modified). Viega's amply probative statements pose no such risk. So Rule 403 presents no barrier to admission here.

<u>Bethea's Order to Murder CW-3</u>.   In its trial brief, the government described how Bethea, Centeio, and CW-3 worked together to shoot Victim No. 11 on June 11, 2018:



[June 11, 2018, shooting at 679 Columbia Road by Bethea, Centeio, and CW-3]

CW-3 also testified that several days later, while hanging out with other Cameron Street members on Howe Street, Centeio told CW-3, "Freeze (Bethea) really don't miss" and "he didn't miss a shot" when targeting the victim.  The trial brief also explained how agents had recorded a post-arrest statement where Bethea had asked a fellow inmate (CW-5) to pass on an order to kill CW-3 to a younger, out-of-custody Cameron Street member:

    CW-5:        You want me to tell that nigga [shooter] anything else?

    BETHEA:    Nah

    CW-5:        Just tell him to get it done?

    BETHEA:    Stay safe out there.

9

| | |
|---|---|
| CW-5: | [laughed] You know the little bitch gonna get bloody! |
| BETHEA: | Tell him, nah, never mind, I don't even want to send the message through you. |
| CW-5: | What! Say it! |
| BETHEA: | Be like yeah, see what's up, he knows, you know? You know? **All of us in a tight spot**. |
| CW-5: | All of us in a tight spot, I got you baby. |
| BETHEA: | **We all got one problem.  Handle that**. |
| CW-5: | We all got one problem. Handle that. I got you. |

It is true, as ELLIOTT's motion states, that Bethea's relationship with Cameron Street became strained after he committed the attempted murder with Centeio and CW-3. On July 13, 2018, one month after the attempted murder, Bethea, along with co-defendants Michael Nguyen, a/k/a "Asian," and Brendon Amado, committed a home invasion robbery of Victim No. 12—a drug dealer—and Victim No. 13—the girlfriend of Victim No. 12—at 147 Rockland Street in Canton. The robbers, wearing masks and dark hoodies and carrying firearms, broke into the home through the back door. Victim No. 12 ran out of the front door of the house and called 911; Victim No. 13 remained in the house. Victim No. 13 was brought into the living room, punched in the head, had a gun put to her head, and had a pillow put in front of her face as men ransacked the house and demanded to know "where's the stuff, where's the money, where's your boyfriend?" After the robbers stole $2,000 in cash, they fled in a silver Ford F-150 pick-up truck. Canton Police officers responded to the 911 call and pursued the men in the truck until it abruptly stopped in Stoughton, where the cruiser collided with the truck. An image from the police cruiser dashboard camera captured Bethea running from the truck with a firearm in his hand:



From Bethea's flight path, officers recovered a loaded Smith and Wesson 9-millimeter pistol (ECF No. 403, Count Two, ¶ 10(aa); Count Forty and Forty-One).

When Bethea was arrested, he participated in a lengthy video-recorded post-Miranda interview with detectives. While the recording consisted almost entirely of detectives urging Bethea (without success) to provide information about the robbery, the fact that he sat for the post-Miranda interview led some members of Cameron Street to view Bethea with suspicion or hostility. Indeed, in a portion of the conversation between Viega and CW-3 after the Duarte murder not quoted by ELLIOTT in his motion, Viega reported to CW-3 that now that the Duarte murder had been completed, "I'm gonna kill Freeze (Bethea), then I'm done."

Why the Bethea Statements Are Admissible. First, much of the content of Bethea's statement is not hearsay. A statement is not hearsay unless it is offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Therefore, threats and requests do not constitute hearsay. United States v. Bowles, 751 F.3d 35, 40 (1st Cir. 2014); United States v. Diaz, 597 F.3d 56, 65 (1st Cir. 2010) ("[I]nstructions or requests . . . categorically fall outside the hearsay rule.") For instance, there is no truth underlying an order to "Handle that." Those words are offered to show that they were said – not to prove that their contents were true.

Alternatively, the statements are admissible as coconspirator statements. ELLIOTT has it

wrong when he posits that the government must prove that Bethea was still in the Cameron Street conspiracy when he made his recorded statement.  "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence.'" Smith v. United States, 568 U.S. 116, 111 (2013), quoting Hyde v. United States, 225 U.S. 347, 369 (1912) (internal citations omitted).  The government does not bear the burden "of proving the nonexistence of withdrawal"; the defendant, instead, bears the burden of establishing that he withdrew from a conspiracy.  Id. at 112.  Moreover, "[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy."  Id. at 112-113.  Instead, a defendant arguing withdrawal must show "affirmative action . . . to disavow or defeat the purpose of the conspiracy."  Id. at 113, quoting Hyde, 225 U.S. at 369.

Whatever some of the members of Cameron Street thought of Bethea's home invasion post-arrest statement to the police, there is no evidence that Bethea withdrew from the conspiracy.  Indeed, Bethea's statements to CW-5 are couched in terms of group, not personal, benefits: "all of us in a tight spot" and "we all got one problem, handle that" are barely coded directives to murder CW-3 before CW-3 can provide evidence against Bethea and the other members of Cameron Street identified in the third superseding indictment.  This murder plot is exactly the kind of act that would benefit the entire Cameron Street enterprise – murdering a testifying coconspirator shields all Cameron Street members from being accountable for their violent conduct.

As set forth in the government's trial brief, these statements are admissible as coconspirator

statements.[5] Moreover, given Bethea's likely unavailability, see Fed. R. Evid. 804(a)(1),[6] the statements will also be independently admissible as statements against interest. See Veloz, 948 F.3d at 430-31 (statements of coconspirator made unwittingly to a Government informant in prison were nontestimonial and sufficiently self-inculpatory to be admitted as statements against interest), citing Barone, 114 F.3d at 1295, and Williamson v. United States, 512 U.S. 594, 600, 604 (1994).

---

[5] See ECF No. 1332 at 19-20, citing United States v. Mayfield, 909 F.3d 956, 960–62 (8th Cir. 2018) (statements made by coconspirator from jail deemed admissible under coconspirator exception where the statements were "efforts to protect and conceal the existence of the conspiracy"); United States v. Alcorta, 853 F.3d 1123, 1139 (10th Cir. 2017) (observing that "a conspiracy does not end simply because one conspirator has been arrested," "a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy," and, "[w]hen a conspiracy is ongoing, statements that relate to avoiding detection by law enforcement personnel can be in furtherance of the conspiracy." (cleaned up)); United States v. Green, 158 F.4th 1347, 1367–69 (11th Cir. 2025) (concerns expressed by coconspirator in letter sent from jail that gang members were violating the "silence & secrecy" rule deemed admissible under coconspirator exception); United States v. Howard, 115 F.3d 1151, 1156 (4th Cir. 1997) (observing that "[u]nfortunately, a conspiracy's activities do not always end when some of its members go to jail," and holding coconspirators jailhouse conversations admissible).

[6] In his plea agreement and at his Rule 11 hearing, Bethea admitted he was a member of the Cameron Street racketeering conspiracy and admitted that he committed the June 11, 2018, attempted murder discussed above with Centeio and CW-3 (ECF No. 647). Bethea did not admit, and in fact vigorously contested, whether he conspired to murder CW-3. Accordingly, Bethea would likely have a valid Fifth Amendment privilege concerning this act.

13

Conclusion. For the reasons set forth above, the Court should deny ELLIOTT's motions in limine to preclude the introduction of Viega's statements to CW-3 and Bethea's recorded jail conversation.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Christopher Pohl
Christopher Pohl
Brian A. Fogerty
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 9, 2026.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney